UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| CHARLES TAYLOR, | ) |
|           Plaintiff, | ) |
| v. | ) No. 2:19-cv-304-JPH-MJD |
| KRISTEN DAUSS, et al. | ) |
|           Defendants. | ) |

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

Charles Taylor alleges that Defendants violated his constitutional rights by designating him to a mental health unit of Wabash Valley Correctional Facility and involuntarily medicating him with anti-psychotic drugs. Dkt. 9. Defendants have filed motions for summary judgment. Dkt. 55; dkt. 62. For the following reasons, the motions for summary judgment are **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that there is no genuine dispute as to any material fact and, therefore, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

*Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 572–73 (7th Cir. 2017).

Parties must support factual assertions by citing to specific parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. Facts

Along with their motions for summary judgment, Defendants filed and served Mr. Taylor with notices regarding his right to respond and submit evidence in opposition to the motions for summary judgment. Dkt. 58; dkt. 64. The notices informed Mr. Taylor, among other things, that "[e]ach of the facts stated in the 'Statement of Material Facts Not in Dispute' which accompanies the motion for summary judgment will be accepted by the court as being true unless

2

you submit your own affidavits or other admissible evidence disputing those facts." *Id.* The notices also quoted relevant portions from Federal Rule of Civil Procedure 56 and Local Rule 56-1. *Id.*

Mr. Taylor did not respond to Defendants' motions for summary judgment with a Statement of Material Facts in Dispute that "identifies the potentially determinative facts and factual disputes that [he] contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. Local Rule 56.1. Instead, he filed documents titled, "Oppose Response to the Defendants Motion for Summary Judgment," dkt. 65; dkt. 67, that are respectively three and four pages long. These filings designate no evidence and are not verified. Accordingly, the Court treats Defendants' supported factual assertions as uncontested. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020); S.D. Ind. L.R. 56-1(b), (f).

**A. Parties**

At some point before he was incarcerated, Mr. Taylor was involuntarily held at a mental health facility and diagnosed with schizophrenia. Dkt. 57-5, Taylor Deposition 85:24–88:21. While incarcerated at New Castle Correctional Facility, Mr. Taylor was confined to the Psychiatric Unit due to having been diagnosed with schizophrenia and requiring involuntary medication. Dkt. 57-6 at 16.

From August 2016 until his release from custody in 2019, Mr. Taylor was confined to the Special Needs Unit ("SNU") at Wabash Valley. Dkt. 57-1 at ¶ 6

(Affidavit of Kristen Dauss); Dkt. 57-6 at 211–215 (Charles Taylor Medical Records).

At all times relevant to Mr. Taylor's allegations,

- Kristen Dauss was a licensed psychiatrist employed by Wexford of Indiana, LLC[1] as the Regional Director of Psychiatry. Dkt. 57-1 at ¶¶ 1–2.
- Mary Sims was a licensed psychologist employed as the lead psychologist at Wabash Valley. Dkt. 57-2 at ¶¶ 1–2 (Affidavit of Mary Sims).
- Daniel Rippetoe was a licensed psychiatrist who provided psychiatry services to patients throughout the Indiana Department of Correction as an independent contractor. Dkt. 57-3 at ¶ 1–2 (Affidavit of Daniel Rippetoe).
- Marie Griggs was a behavioral health specialist employed at Wabash Valley. Dkt. 57-4 at ¶ 1 (Affidavit of Marie Griggs).
- Ally Kern was a caseworker employed at Wabash Valley. Dkt. 62-1 at ¶ 5 (Affidavit of Ally Kern).

**B. Wabash Valley Correctional Facility**

Wabash Valley Correctional Facility is a state prison where prisoners committed to the custody of the Indiana Department of Correction are held. Wabash Valley's SNU, where Mr. Taylor was housed, is a unit designed for individuals who require additional services, specifically mental health. Dkt. 57-

---

[1] During the relevant time period for Mr. Taylor, Wexford was under contract with the State of Indiana to provide medical services for inmates in state prison facilities. http://www.wexfordhealth.com/media/pdf/104_PR_Indiana_Contract_Start_(2017-04-03)_FINAL.pdf (last visited Jan. 26, 2022).

2 at ¶ 18. While in the SNU, inmates have access to additional mental health staff members, including group therapy sessions and individualized treatment sessions with an assigned therapist. *Id.*

If a treating physician concludes that an inmate at Wabash Valley would benefit from involuntary medication, the Department of Correction has established criteria that must be met. The requirements include assigning a Medical Treatment Review Committee to conduct a hearing. *Perry v. Sims*, 990 F.3d 505, 509 (7th Cir. 2021). The individuals present at the hearings and serving on the committee for Mr. Taylor varied during his time at Wabash Valley, as outlined below. The named defendants all served on the committee or attended the committee meetings for Mr. Taylor on at least one occasion.[2]

**C. Treatment at Wabash Valley**

While at Wabash Valley, Mr. Taylor's mental healthcare was primarily managed on-site through visits with psychiatrist Brion Bertsch, who is not a defendant in this case. Dkt. 57-1 at ¶ 7; Dkt. 57-6 at 176–79. Dr. Bertsch saw Mr. Taylor on August 16, 2016, shortly after his arrival at Wabash Valley, and noted that Mr. Taylor was receiving Haldol Decanoate 75 mg every three weeks. During this visit, Mr. Taylor reported that "my attorney got me off the involuntary injections so now I take it voluntarily. It was for paranoid schizophrenia, but I

---

[2] The committee was comprised of three individuals, but others would also attend the meetings.

don't have that anymore." *Id.* Mr. Taylor then signed a consent for treatment form, and Dr. Bertsch continued his prescriptions of Haldol. *Id.*

Not long thereafter, Mr. Taylor began refusing his Haldol injection. Dkt. 57-1 at ¶ 8; Dkt. 57-6 at 3. Mr. Taylor continued refusing his injections until January 2017. Dkt. 57-1 at ¶¶ 9–11; Dkt. 57-6 at 1–3. On January 19, 2017, Dr. Bertsch met with Mr. Taylor, noting that he had been refusing Haldol since his transfer, was not attending available mental health groups, and was resistant to the mental health programming that was available on his unit. Dkt. 57-1 at ¶ 12; Dkt. 57-6 at 84–87. Mr. Taylor had also reported his belief that in the evening he was being raped by members of custody staff, but assessments did not reveal signs consistent with physical aggression or sexual assault. Dkt. 57-2 at ¶ 11. At times, Mr. Taylor would report his understanding that these were simply hallucinations, and other times, he would maintain that these interactions had occurred, despite there being no evidence of such an interaction. *Id.*

On January 23, 2017, there was a meeting of the involuntary medication treatment review committee. Dkt. 57-6 at 76–83. Mr. Taylor, Dr. Sims, and Dr. Rippetoe attended the meeting, as well as several other individuals who are not parties to this action.[3] *Id.* The treatment review committee unanimously agreed that Mr. Taylor required involuntary medication and would receive the same 75 mg dose as had been provided at New Castle. Dkt. 57-1 at ¶ 13; Dkt. 57-6 at 74–

---

[3] Those individuals were Dr. Samuel Byrd (physician), Chris Williams (caseworker acting as assisting staff person) and Dr. Fania Lee (Mr. Taylor's therapist). Dkt. 57-6 at 76–83.

6

83. The treatment review committee summary noted that Mr. Taylor's verbal aggression and mental status had resulted in a recent cancellation of a trip out for medical consultation, and that he told the chaplain that he "wanted to be put out of his misery," though he denied wanting to die. Dkt. 57-1 at ¶ 14; Dkt. 57-6 at 76. According to his medical records, on February 1, 2017, Dr. Bertsch met with Mr. Taylor noting he had no side effects, and Mr. Taylor reported that "I act out before I think what I'm doing." Dkt. 57-1 at ¶ 15; Dkt. 57-6 at 70–73.

The treatment review committee met and discussed Mr. Taylor's status on July 21, 2017, January 4, 2018, June 26, 2018, December 11, 2018, and May 29, 2019.[4] Dkt. 57-6 at 40–41, 99–100, 116–117, 123–124. At each meeting, the committee reviewed Mr. Taylor's records and unanimously concluded that medication was necessary because without it, Mr. Taylor experienced delusions and a decline in functioning; became verbally aggressive, noncompliant with

---

[4] Present at the July 21st meeting were Mr. Taylor and Defendants Dr. Sims, Dr. Dauss and Dr. Griggs. Dkt. 57-6 at 45.

Present at the January 4th meeting were Mr. Taylor, Dr. Sims, Dr. Rippetoe, Dr. Dauss, Dr. Griggs, and Ally Kern. Dkt. 57-6 at 104.

Present at the June 26th meeting were Dr. Sims, Dr. Rippetoe, Dr. Dauss, Dr. Griggs, and Ally Kern. Dkt. 57-6 at 93.

Present at the December 11th meeting were Dr. Bertsch, Dr. Sims, Dr. Rippetoe, Dr. Dauss, Dr. Griggs. Dkt. 57-6 at 116.

Present at the May 29th meeting were Dr. Bertsch, Dr. Sims, Dr. Rippetoe. Dkt. 57-6 at 108.

Several other medical professionals attended the treatment review committee meetings, but they are not parties to this lawsuit.

medical care and unable to function in treatment; and required a more restrictive setting. *Id.*

On April 19, 2017, Dr. Dauss met with Mr. Taylor to conduct a medical record review, noting that he had been responding well to his current medications and treatment and showed improved participation in programming following the order for involuntary meds. Dkt. 57-1 at ¶ 17; Dkt. 57-6 at 62–65. Mr. Taylor denied any hallucinations or side effects to medications. *Id.*

On June 4, 2017, Mr. Taylor reported to Dr. Bertsch that he did not need any medication, and that it was causing diffuse muscle "aches," but no report of any headaches. Dkt. 57-1 at ¶ 18; Dkt. 57-6 at 57–61. As a result of his complaint of muscle aches, Dr. Bertsch switched Mr. Taylor's dosage from an injection every three weeks to an injection every four weeks. *Id.* Dr. Bertsch conducted follow-up visits with Mr. Taylor on many occasions during his time in the SNU. Dkt. 57-6 at 32–35, 49–52, 57–60, 66–69, 70–73, 96–99. Each time, Dr. Bertsch noted that Mr. Taylor's medication was effective and noted no further complaints of side effects from the medication. *Id.*

Mr. Taylor appealed the decision of the treatment committee on two occasions: December 11, 2018, and June 26, 2018. Dkt. 57-6 at 118, 121. In his appeal of the December 11th decision, Mr. Taylor stated for the first time that he was suffering from "agonizing headaches" as a side effect of the Haldol. Dkt. 57-6 at 118. He further argued that the Haldol was causing him to act out and he was being used as a "guinea pig" to determine how the medication works. *Id.*

8

Mr. Taylor's appeal was denied by the medical director, Dr. Michael Mitcheff, who found that the medication was in his best interest. Dkt. 57-6 at 119.

### III. Discussion

Mr. Taylor alleges that Defendants violated his constitutional rights by "wrongly holding [him] in mental health unit and forc[ing him] to take medication against [his] will. The medication caused [him] to have agonizing headaches and to act out involuntarily." Dkt. 9. These allegations implicate Mr. Taylor's Eighth Amendment and Fourteenth Amendment rights. Dkt. 13.

Defendants Dauss, Rippetoe, Griggs, and Sims argue that they are entitled to summary judgment because they were not deliberately indifferent to Mr. Taylor's medical needs when they concluded that he would benefit from involuntary medication and that he should be housed in the SNU. Dkt. 56. They further argue that Mr. Taylor was provided with due process before he was involuntarily medicated, and therefore his Fourteenth Amendment rights were not violated. *Id.* Ms. Kern incorporates the arguments of her co-defendants and further argues that as a case worker, she was not personally involved in medical decisions for Mr. Taylor nor was she able to make decisions regarding Mr. Taylor's medication. Dkt. 63. As discussed above, the documents that Mr. Taylor filed in response to Defendants' motions for summary judgment do not designate evidence or substantively respond to Defendants' arguments in favor of summary judgment. Dkts. 65, 67.

9

### A. Deliberate Indifference to Serious Medical Need

At all times relevant to Mr. Taylor's claims, he was a convicted offender. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017).

The Eighth Amendment "standard encompasses both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (internal quotation omitted); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Defendants do not dispute, at least for summary judgment purposes, that Mr. Taylor's diagnosis of schizophrenia is a serious health condition, so the only issue is whether there is evidence from which a reasonable jury could find that Defendants were deliberately indifferent to Mr. Taylor's medical needs.

The subjective element asks whether the defendants were deliberately indifferent to a substantial risk to the prisoner's health and safety. *Eagan*, 987 F.3d at 683. The subjective standard "requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation omitted). Even a showing of medical malpractice is not sufficient. *Id.* "Rather, the evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* at 1030–31.

10

"If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016)). But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal citations omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

11

**1. Dr. Dauss**

Dr. Dauss's involvement in Mr. Taylor's medical care consisted of participation on the treatment review committee that approved his forced medication and a meeting with Mr. Taylor in April 2017. Dkt. 57-1 at ¶¶ 17, 20. Based on her review of Mr. Taylor's medical records, her observations during her meeting with him, and the evidence before the committee on the occasions that she participated, Dr. Dauss concluded, in her medical opinion, that forced medical and housing in the SNU was appropriate. *Id.* at ¶¶ 33, 37.

Mr. Taylor has designated no evidence that Dr. Dauss was aware that Mr. Taylor experienced headaches from the medication. Therefore, there is no evidence that she was deliberately indifferent to any substantial risk to Mr. Taylor's health and safety when she concluded that he was properly housed in the SNU and that he should be involuntarily medicated in light of his reported hallucinations and behavior.[5] Mr. Taylor's mere disagreement with that assessment does not establish deliberate indifference. *Pyles v. Fahim*, 771 F.3d

---

[5] At one point during his deposition, Mr. Taylor refers to Dr. Dauss's role as "everyone's supervisor" as one of the reasons he named her as a defendant in his amended complaint. Dkt. 57-5 at 22:2–23:4. However, "there is no such thing as respondeat superior liability for government officials under § 1983. The supervisor is therefore liable only if she was personally involved in the constitutional violation." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (internal citations omitted). Moreover, to the extent Mr. Taylor named Dr. Dauss only because she allegedly reviewed his grievances, prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance. *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017).

403, 409. Accordingly, Dr. Dauss is entitled to summary judgment as to Mr. Taylor's Eighth Amendment claim against her.

### 2. Drs. Sims and Rippetoe

Dr. Sims's involvement in Mr. Taylor's medical care consisted of participation on the treatment review committee that approved his forced medication and a meeting with Mr. Taylor in January 2018 to discuss advanced directive options. Dkt. 57-2 at ¶¶ 4, 13. Dr. Rippetoe's involvement in Mr. Taylor's medical care consisted only of participation on the treatment review committee that approved his forced medication. Dkt. 57-3 at ¶ 4. Based on their review of Mr. Taylor's medical records and the evidence before the committee on the occasions that they participated, both Drs. Sims and Rippetoe concluded, in their medical opinions, that forced medication and housing in the SNU was appropriate. *Id.* at ¶¶ 18, 20, 21.

Mr. Taylor designated no evidence that Drs. Sims or Rippetoe were aware that Mr. Taylor experienced headaches from the medication. Therefore, there is no evidence that they were deliberately indifferent to Mr. Taylor's medical needs when they concluded that Mr. Taylor was properly housed in the SNU and that he should be involuntarily medicated in light of his reported hallucinations and behavior. Mr. Taylor's mere disagreement with that assessment does not establish deliberate indifference. *Pyles*, 771 F.3d at 409. Accordingly, Drs. Sims

and Rippetoe are also entitled to summary judgment as to Mr. Taylor's Eighth Amendment claim against them.

### 3. Ms. Griggs

Ms. Griggs was a member of Mr. Taylor's treatment team beginning in July 2017. Dkt. 57-4 at ¶ 5. As a resident of the SNU, Mr. Taylor had access to regular group therapy as well as individualized therapy sessions. *Id.* Ms. Griggs was not only involved in group therapy sessions with Mr. Taylor, but also individual therapy sessions, and she also saw Mr. Taylor during rounds in his housing unit. *Id.* at ¶ 6. Ms. Griggs also participated in treatment review committee hearings regarding Mr. Taylor's condition, compliance with treatment and medications, and any recommendations she had regarding his need for medication. *Id.* at ¶ 7. Based on her review of Mr. Taylor's medical records, her interactions with Mr. Taylor during individual and group therapy sessions, and the evidence before the committee on the occasions that she attended, Ms. Griggs concluded, in her professional opinion, that forced medication and housing in the SNU was appropriate for Mr. Taylor. *Id.* at ¶¶ 19–22.

Mr. Taylor has designated no evidence that Ms. Griggs was aware of any headaches that Mr. Taylor experienced from the medication. Therefore, there is no evidence that she was deliberately indifferent to Mr. Taylor's medical needs when she concluded that he was properly housed in the SNU and that he should be involuntarily medicated in light of his reported hallucinations and behavior. Mr. Taylor's mere disagreement with that assessment does not establish deliberate indifference. *Pyles*, 771 F.3d at 409. Accordingly, Ms. Griggs is also

entitled to summary judgment as to Mr. Taylor's Eighth Amendment claim against her.

### 4. Ally Kern

Ms. Kern served as Mr. Taylor's caseworker while he was at Wabash Valley. Dkt. 62-1 at ¶ 5. In her role as a caseworker, Ms. Kern's duties consisted of preparing release paperwork for offenders to assist in their transition back into the community; answering offender requests within her knowledge; providing needed hygiene supplies; gathering information from staff to provide an answer to an offender's question; acting as a liaison between the offender and the judicial system; and conducting 90-day reviews with inmates for concerns they had. *Id.* at ¶ 3. Ms. Kern attended some of the treatment committee meetings regarding the involuntary medication of Mr. Taylor, however, as a caseworker at Wabash Valley, she was not designated as clinical personnel and did not make any medical decisions for Mr. Taylor. *Id.* at ¶ 11. Mr. Taylor conceded as much in his deposition, stating "[s]ir, to tell you the truth about [Ms. Kern], I kind of believe that her hands were tied up. I think it was over her head. It wasn't she wanted to assist me or not, I don't believe that." Dkt. 57-5 at 89:14–17. The record does not show any evidence that Ms. Kern was deliberately indifferent to Mr. Taylor's medical needs. There is nothing to suggest Ms. Kern had the ability to change his medication or housing unit, but even if she did, there is also no evidence showing that she was deliberately indifferent when making those decisions.

Accordingly, Ms. Kern is entitled to summary judgment as to Mr. Taylor's Eighth Amendment claim against her.

### B. Due Process for Involuntary Medication

"[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). "[T]here is little dispute in the psychiatric profession that proper use of [antipsychotic medications] is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." *Id.* at 226.

When a prisoner opposes use of medication to treat mental illness, due process requires: (1) the State must find that medication is in the prisoner's medical interest (independent of institutional concerns); (2) the panel that reviews a treating physician's decision to prescribe forced medication must make an impartial and independent judgment, taking into account the prisoner's best interest; and (3) the prisoner must be allowed the opportunity to argue before the review panel that he does not need forced medication. *Harper*, 494 U.S. at 222, 227, 233; *see also Perry v. Sims*, 990 F.3d 505, 512 (7th Cir. 2021).

Here, the designated evidence shows that each of the *Harper* requirements were satisfied before Mr. Taylor was involuntarily medicated. Even before arriving at Wabash Valley, Mr. Taylor had been involuntarily treated with Haldol due to his diagnosis of schizophrenia. Dkt. 57-6 at 16–31. At Wabash Valley,

16

Mr. Taylor again refused to take his prescribed Haldol so Dr. Bertsch, his treating physician, ordered that it be given involuntarily. Dkt. 57-6 at 84–87. Dr. Bertsch based his decision on the fact that Mr. Taylor was not attending groups, his resistance to SNU programming, and his history of appearing to be more functional when he was getting Haldol injections. Dkt. 57-6 at 84.

At the January 2017 meeting, the treatment committee reviewed the relevant evidence about Mr. Taylor including: his history of fixed delusions of being continually raped in prison while in a single cell; his reoccurring feeling that "his spine is separating;" his belligerence with staff; his propositioning a staff member while naked; his verbal aggression and mental status resulting in the cancellation of a trip out for medical consultation; and his informing the chaplain that, while he did not want to die, he "wanted to be put out of his misery." Dkt. 57-6 at 76. The committee then made an independent decision that Mr. Taylor would be involuntarily medicated. The committee based its decision on the considerations discussed at the January 2017 meeting, the fact that Mr. Taylor had previously been stabilized on medication, and the fact that Mr. Taylor had shown deterioration since he had started refusing those medications. This decision considered Mr. Taylor's medical needs and his best interest, in accordance with the first two requirements under *Harper*. The treatment review committee undertook the same process at subsequent meetings, and each time reached the same conclusion. Dkt. 57-6 at 40, 123, 99, 108. The committee specifically noted that Mr. Taylor's "improvement was characterized as 'dramatic'

by [a] physician who attended him before and after stabilization on involuntary medication." Dkt. 57-6 at 40.

As is required, Mr. Taylor received advanced notice of all treatment committee meetings. Dkt. 57-6 at 135, 131, 129, 122, 120, 114. The notices clearly informed him of the rights he had at the hearing. *Id.* Mr. Taylor attended three of the meetings in-person. Dkt. 57-6 at 76, 40, 99, 124, 117, 108. On those occasions when Mr. Taylor opted to exercise his right to attend the meetings, Mr. Taylor was given an opportunity to speak. Dkt. 57-6 at 40, 76, 99. Mr. Taylor made various arguments to the committee, including that the allegations against him were false and that he is "not a mental patient." Dkt. 57-6 at 40. When a clinician made the comment that he is doing much better on the medication his response was, "I am better because of who I am." "I'm doing what works, more focused, more mindful." *Id.* Because Mr. Taylor was given advance notice before each of the meetings and because he was permitted to make arguments to the committee on his behalf during the hearings, the third component under *Harper* was also satisfied. *See Fuller v. Dillon*, 236 F.3d 876, 882 (7th Cir. 2001) (citing *Sullivan v. Flannigan*, 8 F.3d 591, 598 (7th Cir. 1993)) ("[T]he third factor that the state must satisfy before attempting to forcibly medicate an inmate is to allow the prisoner the opportunity 'to argue capably before a review tribunal that he does not need forced medication.'"))

Under these circumstances, after Mr. Taylor refused antipsychotic medications, his due process rights under the Fourteenth Amendment were not

violated when the involuntary administration of antipsychotic medication was approved.

## IV. Conclusion

For the foregoing reasons, Defendants Kristen Dauss, Daniel Rippetoe, Marie Griggs, Mary Sims, and Ally Kern's motions for summary judgment, dkts. [55] and [62], are **granted**. Mr. Taylor's "motion for court assistance," dkt. [69], is **granted** to the extent that he is seeking an update about the instant case. To the extent he is seeking information about his habeas case, *Taylor v. Warden*, No. 1:21-2575-RLY-DML, the Court notes that case was closed in November 2021. *See Taylor v. Warden*, No. 1:21-2575-RLY-DML, dkt. 16.

Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 3/25/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CHARLES TAYLOR
1832 Goodlet Ave.
Indianapolis, IN 46222

All Electronically Registered Counsel